**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STORMANS, INC., doing business as
Ralph's Thriftway; RHONDA
MESLER; and MARGO THELEN,
*Plaintiffs-Appellees*,

v.

JOHN WIESMAN, Secretary of the
Washington State Department of
Health; DAN RUBIN; ELIZABETH
JENSEN; EMMA ZAVALA-SUAREZ;
SEPI SOLEIMANPOUR, Members of
the Washington Pharmacy Quality
Assurance Commission; MARK
BRENMAN, Executive Director of the
Washington Human Rights
Commission; MARTIN MUELLER,
Assistant Secretary of the
Washington State Department of
Health, Health Services Quality
Assurance; CHRISTOPHER BARRY;
NANCY HECOX; TIM LYNCH; STEVEN
ANDERSON; ALBERT LINGGI;
MAUREEN SIMMONS SPARKS;
MAURA C. LITTLE; KRISTINA
LOGSDON, Members of the
Washington Pharmacy Quality
Assurance Commission,
*Defendants-Appellants*,

No. 12-35221

D.C. No.
3:07-cv-05374-
RBL

and

JUDITH BILLINGS; RHIANNON
ANDREINI; JEFFREY SCHOUTEN;
MOLLY HARMON; CATHERINE
ROSMAN; TAMI GARRARD,
          *Defendant-Intervenors*.

---

STORMANS, INC., doing business as
Ralph's Thriftway; RHONDA
MESLER; MARGO THELEN,
          *Plaintiffs-Appellees*,

                    v.

JOHN WIESMAN, Secretary of the
Washington State Department of
Health; DAN RUBIN; ELIZABETH
JENSEN; EMMA ZAVALA-SUAREZ;
SEPI SOLEIMANPOUR, Members of
the Washington Pharmacy Quality
Assurance Commission; MARK
BRENMAN, Executive Director of the
Washington Human Rights
Commission; MARTIN MUELLER,
Assistant Secretary of the
Washington State Department of
Health, Health Services Quality
Assurance; CHRISTOPHER BARRY;
NANCY HECOX; TIM LYNCH; STEVEN
ANDERSON; ALBERT LINGGI;
MAUREEN SIMMONS SPARKS;

No. 12-35223

D.C. No.
3:07-cv-05374-
RBL

OPINION

MAURA C. LITTLE; KRISTINA
LOGSDON, Members of the
Washington Pharmacy Quality
Assurance Commission,
*Defendants*,

and

JUDITH BILLINGS; RHIANNON
ANDREINI; JEFFREY SCHOUTEN;
MOLLY HARMON; CATHERINE
ROSMAN; TAMI GARRARD,
  *Defendant-Intervenors–Appellants*.

Appeals from the United States District Court
for the Western District of Washington
Ronald B. Leighton, District Judge, Presiding

Argued and Submitted
November 20, 2014—Portland, Oregon

Filed July 23, 2015

Before:  Susan P. Graber, Richard R. Clifton,
and Mary H. Murguia, Circuit Judges.

Opinion by Judge Graber

# SUMMARY[*]

## Civil Rights

The panel reversed the district court's judgment, entered following a bench trial, in an action brought by the owner of a pharmacy and two pharmacists who have religious objections to delivering emergency contraceptives, and who challenged Washington state rules requiring the timely delivery of all prescription medications by licensed pharmacies.

The rules permit pharmacies to deny delivery for certain business reasons, such as fraudulent prescriptions or a customer's inability to pay. The rules also permit a religiously objecting individual pharmacist to deny delivery, so long as another pharmacist working for the pharmacy provides timely delivery.

Addressing plaintiffs' free exercise claim, the panel held that the rules, promulgated by the Washington Pharmacy Quality Assurance Commission, were facially neutral. The panel also held that the rules operated neutrally because they prescribed and proscribed the same conduct for all, regardless of motivation. The panel further held that the rules were generally applicable and that according to the evidence produced at trial, the rules (1) were not substantially underinclusive in their prohibition of religious objections but allowance of certain secular exemptions; (2) did not create a regime of unfettered discretion through the individualized

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

exemptions that would permit discriminatory treatment of religion or religiously motivated conduct; and (3) were not selectively enforced.

Because the rules were neutral and generally applicable, rational basis review applied. The panel held that the rules were rationally related to Washington's legitimate interest in ensuring that its citizens have safe and timely access to their lawful and lawfully prescribed medications. The panel rejected plaintiffs' equal protection claim on the same basis as the free exercise claim.

Addressing plaintiffs' due process claim, the panel declined to recognize a new fundamental right. The panel held that it was unconvinced that the right to own, operate, or work at a licensed professional business free from regulations requiring the business to engage in activities that one sincerely believes lead to the taking of human life was so rooted in conscience and the Nation's tradition as to be ranked as fundamental.

**COUNSEL**

Thomas L. Boeder (argued), Andrew L. Greene, Katherine D. Bennett, and Noah Guzzo Purcell, Perkins Coie LLP, Seattle, Washington; Lisa M. Stone, Molly Terwilliger, and Janet Chung, Legal Voice, Seattle, Washington; Laura Einstein, Planned Parenthood of the Great Northwest, Seattle, Washington, for Defendant-Intervenors–Appellants.

Alan D. Copsey (argued), Deputy Solicitor General, Robert M. McKenna, Attorney General, Rene Tomisser, Senior Counsel, Joyce A. Roper, Senior Assistant Attorney General, Olympia, Washington, for Defendants-Appellants.

Kristen K. Waggoner (argued) and Steven T. O'Ban, Ellis, Li & McKinstry PLLC, Seattle, Washington; Michael W. McConnell, Stanford, California; Luke W. Goodrich, The Becket Fund for Religious Liberty, Washington, D.C.; Steven H. Aden, Alliance Defending Freedom, Scottsdale, Arizona, for Plaintiffs-Appellees.

Sara L. Ainsworth, University of Washington School of Law, Seattle, Washington; Michael S. Wampold, Peterson Wampold Rosato Luna Knopp, Seattle, Washington, for Amici Curiae Organizations and Experts Dedicated to Ending Rape and Intimate Partner Violence.

Mary Re Knack and Sarah Joye, Williams, Kastner & Gibbs PLLC, Seattle, Washington, for Amici Curiae Public Health and Human Rights Organizations, et al.

Alex J. Luchenitser, Ayesha N. Khan, and Benjamin N. Hazelwood, Americans United for Separation of Church and State, Washington, D.C., as Amicus Curiae.

Shannon P. Minter, Christopher F. Stoll, Angela Perone, Asaf Orr, and Ashland Johnson, National Center for Lesbian Rights, San Francisco, California, for Amici Curiae AIDS United, et al.

Stephanie Toti, Senior Staff Attorney, New York, New York, as Amici Curiae Center for Reproductive Rights and for National Women's Law Center.

Jessica A. Skelton and Kymberly K. Evanson, Pacifica Law Group LLP, Seattle, Washington, for Amici Curiae Religious and Religiously-Affiliated Organizations and Individual Clergy.

Denise M. Burke and Mailee R. Smith, Americans United for Life, Washington, D.C., for Amici Curiae Members of the United States Congress.

Jason A. Levine and Eric A. White, Vinson & Elkins LLP, Washington, D.C., for Amici Curiae American Pharmacists Association, et al.

Mark E. Chopko, Marissa Parker, and Zeenat A. Iqbal, Stradley Ronon Stevens & Young, LLP, Washington, D.C., for Amici Curiae The Muslim Public Affairs Council, et al.

Christian J. Ward, Scott A. Keller, J. Campbell, and April L. Farris, Yetter Coleman LLP, Austin, Texas; Douglas Laycock, University of Virginia Law School, Charlottesville, Virginia, for Amici Curiae Constitutional Law Professors.

Dorinda C. Bordlee and Nikolas T. Nikas, Bioethics Defense Fund, Scottsdale, Arizona; Kimberlee Wood Colby, Christian

Legal Society, Springfield, Virginia, for Amici Curiae Christian Medical Association, et al.

Kevin Marshall and Richard M. Re, Jones Day, Washington, D.C., for Amici Curiae The Church of the Lukumi Babalu Aye, Inc., et al.

Alexander Dushku and Justin W. Starr, Kirton/McConkie, Salt Lake City, Utah, for Amici Curiae Washington State Catholic Conference, et al.

Carrie L. Severino and Ammon Simon, Judicial Education Project, Washington, D.C., for Amici Curiae Agudath Israel of America, et al.

Sean D. Jordan, Kent C. Sullivan, Danica L. Milios, Travis Mock, and Peter Hansen, Sutherland Asbill & Brennan LLP, Austin, Texas; Jeffrey C. Mateer and Justin E. Butterfield, Liberty Institute, Plano, Texas, for Amicus Curiae Liberty Institute.

Matthew T. Nelson and Elinor Jordan, Warner Norcross & Judd LLP, Grand Rapids, Michigan, for Amicus Curiae The Bruderhof and Hopewell Mennonite Church.

Sandra Payne Hagood, La Jolla, California; Thomas C. Berg, University of St. Thomas Law School, Minneapolis, Minnesota, for Amici Curiae Individual Physicians, Obstetricians, and Health Care Practitioners Licensed in the State of Washington.

**OPINION**

GRABER, Circuit Judge:

In order to promote patient safety in the state of Washington, the Washington Pharmacy Quality Assurance Commission ("Commission") promulgated rules requiring the timely delivery of all prescription medications by licensed pharmacies. The rules permit pharmacies to deny delivery for certain business reasons, such as fraudulent prescriptions or a customer's inability to pay. The rules also permit a religiously objecting individual pharmacist to deny delivery, so long as another pharmacist working for the pharmacy provides timely delivery. But, unless an enumerated exemption applies, the rules require a pharmacy to deliver all prescription medications, even if the owner of the pharmacy has a religious objection.

Plaintiffs are the owner of a pharmacy and two individual pharmacists who have religious objections to delivering emergency contraceptives such as Plan B and *ella*. They challenge the rules on free exercise and other constitutional grounds. After a bench trial, the district court held that the rules violate the Free Exercise and Equal Protection Clauses, and the court permanently enjoined enforcement of the rules. Because we conclude that the rules are neutral and generally applicable and that the rules rationally further the State's interest in patient safety, we reverse.

## BACKGROUND

### A.  History of the Rules

The Commission regulates the practice of pharmacy in the state of Washington.  Wash. Rev. Code § 18.64.001.  A comprehensive regulatory scheme tasks the Commission to, among other duties, "[r]egulate the practice of pharmacy and enforce all laws placed under its jurisdiction"; "[e]stablish the qualifications for licensure of pharmacists or pharmacy interns"; conduct and manage disciplinary proceedings; assist in the enforcement of the pharmacy laws and regulations; and "[p]romulgate rules for the dispensing, distribution, wholesaling, and manufacturing of drugs and devices and the practice of pharmacy for the protection and promotion of the public health, safety, and welfare."  *Id.* § 18.64.005(1), (3)–(7).

To "practice pharmacy or to institute or operate any pharmacy," a person must obtain a license.  *Id.* § 18.64.020. A "pharmacist" is defined as "a person duly licensed by the commission to engage in the practice of pharmacy," *id.* § 18.64.011(20), and a "pharmacy" is defined as "every place properly licensed by the commission where the practice of pharmacy is conducted," *id.* § 18.64.011(21).  The "practice of pharmacy" includes "[i]nterpreting prescription orders; the compounding, dispensing, labeling, administering, and distributing of drugs and devices; . . . [and] the proper and safe storing and distributing of drugs and devices and maintenance of proper records thereof."  *Id.* § 18.64.011(23). Under what is known as the "Stocking Rule," promulgated in 1967, a pharmacy "must maintain at all times a representative assortment of drugs" approved by the Food and Drug Administration ("FDA") "in order to meet the pharmaceutical

needs of its patients." Wash. Admin. Code § 246-869-150(1). Violation of an administrative rule "shall constitute grounds for refusal, suspension, or revocation of licenses or any other authority to practice issued by the commission." Wash. Rev. Code § 18.64.005(7).

In 2007, the Commission unanimously and formally adopted two new administrative rules. The first rule, known as the "Pharmacist Responsibility Rule," amends a section titled "Pharmacist's professional responsibilities," and it applies to the conduct of individual pharmacists. Wash. Admin. Code § 246-863-095. Under that rule, "[i]t is considered unprofessional conduct" for a pharmacist to: "(a) Destroy unfilled lawful prescription[s]; (b) Refuse to return unfilled lawful prescriptions; (c) Violate a patient's privacy; (d) Discriminate against patients or their agent in a manner prohibited by state or federal laws; and (e) Intimidate or harass a patient." *Id.* § 246-863-095(4). Importantly, the parties agree that the foregoing rule does *not* require an individual pharmacist to dispense medication if the pharmacist has a religious, moral, philosophical, or personal objection to delivery. *Stormans, Inc. v. Selecky* ("*Stormans I*"), 586 F.3d 1109, 1116 (9th Cir. 2009). A pharmacy may "accommodate" an objecting pharmacist in any way the pharmacy deems suitable, including having another pharmacist available in person or by telephone. *Id.*

The second rule, known as the "Delivery Rule," is titled "Pharmacies' responsibilities" and applies to pharmacies. Wash. Admin. Code § 246-869-010. That rule requires pharmacies to "deliver lawfully prescribed drugs or devices to patients and to distribute drugs and devices approved by the [FDA] for restricted distribution by pharmacies, or provide a therapeutically equivalent drug or device in a

timely manner consistent with reasonable expectations for filling the prescription." *Id.* § 246-869-010(1). The Delivery Rule also prohibits pharmacies from destroying or refusing to return an unfilled lawful prescription; violating a patient's privacy; or unlawfully discriminating against, intimidating, or harassing a patient. *Id.* § 246-869-010(4). By contrast to the Pharmacist Responsibility Rule, the Delivery Rule contains no exemption for pharmacies whose owners object to delivery on religious, moral, philosophical, or personal grounds. An objecting pharmacy must deliver the drug or device and may not refer a patient to another pharmacy.

Under the Delivery Rule's enumerated exemptions, a pharmacy need not deliver a drug or device

> [in] the following or substantially similar circumstances:
>
> (a) Prescriptions containing an obvious or known error, inadequacies in the instructions, known contraindications, or incompatible prescriptions, or prescriptions requiring action in accordance with WAC 246-875-040[;]
>
> (b) National or state emergencies or guidelines affecting availability, usage or supplies of drugs or devices;
>
> (c) Lack of specialized equipment or expertise needed to safely produce, store, or dispense drugs or devices, such as certain drug compounding or storage for nuclear medicine;

(d) Potentially fraudulent prescriptions; or

(e) Unavailability of drug or device despite good faith compliance with [the Stocking Rule].

*Id.* § 246-869-010(1). The Delivery Rule also provides that pharmacies are not required to deliver a drug or device "without payment of their usual and customary or contracted charge." *Id.* § 246-869-010(2).

The Delivery Rule and the amended Pharmacist Responsibility Rule took effect on July 26, 2007.

## B. Procedural History

Plaintiffs filed this action on July 25, 2007, the day before the rules were to take effect. Plaintiffs include Stormans, Inc., a family business that operates Ralph's Thriftway ("Ralph's"), a grocery store and pharmacy located in Olympia, Washington. Stormans, Inc., declines to stock Ralph's with the emergency contraceptive drugs Plan B or *ella* because the pharmacy's owners have religious objections to their use.[1] Since 2006, twenty-four complaints have been

---

[1] Plan B is an emergency contraceptive containing levonorgestrel, a synthetic hormone similar to progesterone. *Tummino v. Hamburg*, 936 F. Supp. 2d 162, 164–65 (E.D.N.Y. 2013). At the time of the bench trial, Plan B was available for "behind-the-counter," non-prescription distribution for women at least 17 years old and via prescription for women under 17. *Id.* *ella* is an emergency contraceptive containing the chemical compound ulipristal acetate. Approved by the FDA in 2010, *ella* is currently available only with a prescription. *Id.* Plaintiffs amended their complaint to include *ella* within their requests for relief. Plaintiffs

filed with the Commission against Ralph's in connection with this policy. Twenty-one of the complaints have been dismissed for procedural reasons, but three remain pending.

The other two Plaintiffs are Rhonda Mesler and Margo Thelen, Washington-based pharmacists who are unwilling to dispense Plan B or *ella* for religious reasons. Before 2007, Mesler and Thelen referred customers who were seeking Plan B to another pharmacy. After the regulations took effect, Thelen was transferred to a different pharmacy because her employer could not accommodate her religious objection. Mesler alleges that she will be forced to move out-of-state if the regulations are upheld.

Defendants include the Commission's members and the Secretary of the Washington State Department of Health. The district court also permitted several Washington residents to intervene to defend the rules. Intervenors Rhiannon Andreini and Molly Harmon had negative experiences after being denied or delayed access to Plan B. Intervenor Dr. Jeffrey Schouten is HIV-positive, and Intervenor Judith Billings has AIDS; both fear being denied timely access to their prescription medications.

Plaintiffs seek declaratory and injunctive relief under the Free Exercise Clause, the Due Process Clause, the Equal Protection Clause, and the Supremacy Clause. Plaintiffs limit their claims to the Pharmacist Responsibility Rule and the Delivery Rule; they do not challenge the Stocking Rule. *Stormans I*, 586 F.3d at 1118.

---

believe that dispensing these drugs "constitutes direct participation in the destruction of human life."

In 2007, the district court issued a preliminary injunction prohibiting enforcement of the rules. The district court held that Plaintiffs were likely to succeed on the merits of their free exercise claim because the rules were neither neutral nor generally applicable, and the rules could not survive strict scrutiny. The court preliminarily enjoined Defendants from enforcing the rules against any pharmacy or pharmacist who declined to dispense Plan B.

In 2009, we vacated the preliminary injunction and remanded for further proceedings. *Stormans I*, 586 F.3d 1109. We held that, on the record presented, the rules were both neutral and generally applicable. *Id.* at 1127–37. We declined to conduct rational basis review in the first instance and instead remanded for the district court to apply that standard in assessing whether Plaintiffs were likely to succeed on the merits. *Id.* at 1137–38, 1142. We further held that the district court had erred in its analysis of the remaining preliminary injunction factors and that it had abused its discretion in enjoining enforcement of the rules as to all pharmacies and pharmacists, rather than limiting the relief to the named Plaintiffs. *Id.* at 1138–40. Also in 2009, the district court stayed enforcement of the two rules in dispute.

In 2010, the Commission commenced a new rule-making process to consider whether to amend the rules to allow for facilitated referrals in the face of a conscientious objection to a prescription medication. Because such an amendment would have mooted Plaintiffs' claims, the parties agreed to delay trial until the rule-making process was complete. Over Intervenors' objections, Defendants stipulated that "facilitated referrals are often in the best interest of patients, pharmacies, and pharmacists; that facilitated referrals do not pose a threat to timely access to lawfully prescribed

medications[;] and that facilitated referrals help assure timely access to lawfully prescribed medications." The stipulation also provided that the district court's 2009 stay order would remain in effect. In late 2010, after receiving public comments and conducting additional hearings, the Commission voted not to amend the rules.

After a twelve-day bench trial, the district court ruled in Plaintiffs' favor, issuing an opinion accompanied by extensive findings of fact and conclusions of law. *Stormans, Inc. v. Selecky*, 854 F. Supp. 2d 925 (W.D. Wash. 2012). The court again held that the rules were neither neutral nor generally applicable and that they did not survive strict scrutiny. *Id.* at 967–90. Accordingly, the district court held that Plaintiffs were entitled to relief on their free exercise claim. *Id.* at 992. Because Plaintiffs' equal protection claim was coextensive with their free exercise claim, the court ruled, in an unpublished supplemental order, that Plaintiffs also had established an equal protection violation. Although the court implied that Plaintiffs had a meritorious due process claim, premised on the right "to refrain from taking human life," the court ultimately rejected that claim. *Id.* at 990–91. Finally, the district court rejected Plaintiffs' contention that the rules are preempted by federal law under the Supremacy Clause. *Id.* at 991.

The court entered a final judgment (1) declaring the Delivery Rule, the Pharmacist Responsibility Rule, and the Stocking Rule[2] unconstitutional under the Free Exercise Clause; (2) declaring those rules unconstitutional under the Equal Protection Clause; (3) enjoining Defendants from

---

[2] The district court held the Stocking Rule unconstitutional even though Plaintiffs did not challenge it.

enforcing those rules against Plaintiffs; and (4) retaining jurisdiction to enforce the judgment. Defendants and Intervenors timely appeal.

## STANDARD OF REVIEW

We review de novo a district court's conclusions of law following a bench trial. *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1067 (9th Cir. 2008) (en banc). We review for clear error the court's findings of fact.[3] *Lentini v. Cal. Ctr. for the Arts, Escondido*, 370 F.3d 837, 843 (9th Cir. 2004).

## DISCUSSION

### A. Free Exercise Claim

The First Amendment's Free Exercise Clause, which applies to the states via the Fourteenth Amendment, *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), provides that

---

[3] The parties dispute this standard of review. Defendants and Intervenors contend that we should review de novo the district court's findings because they pertain to "mixed questions of law and fact that implicate constitutional rights." *Berger v. City of Seattle*, 569 F.3d 1029, 1035 (9th Cir. 2009) (en banc). Moreover, Defendants and Intervenors note that we review a district court's findings of fact "'with special scrutiny'" when a district court "'engage[s] in the regrettable practice of adopting the findings drafted by the prevailing party wholesale.'" *Silver v. Exec. Car Leasing Long-Term Disability Plan*, 466 F.3d 727, 733 (9th Cir. 2006) (alteration in original) (quoting *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1385 (9th Cir. 1984)). Plaintiffs, on the other hand, argue that the district court's factual findings are reviewed for clear error. Because we would reach the same conclusion under either a "clear error" or "de novo" standard, we apply the standard of review that Plaintiffs seek, and we need not resolve the parties' dispute.

"Congress shall make no law . . . prohibiting the free exercise [of religion]."  U.S. Const. amend. I.  The right to exercise one's religion freely, however, "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes)  conduct  that  his  religion  prescribes  (or proscribes)."  *Emp't Div. v. Smith*, 494 U.S. 872, 879 (1990) (internal quotation marks omitted); *see also United States v. Lee*, 455 U.S. 252, 261 (1982) ("When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity.").

Under the rule announced in *Smith* and affirmed in *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah* ("*Lukumi*"), 508 U.S. 520, 531 (1993), a neutral law of general application need not be supported by a compelling government interest even when "the law has the incidental effect of burdening a particular religious practice."[4]  Such laws need only survive rational basis review.  *Miller v. Reed*,

---

[4] Last year, the Supreme Court addressed the statutory protections afforded by the Religious Freedom Restoration Act of 1993 ("RFRA"). *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014).  RFRA, which applies only to federal laws, provides protections to religious practices above and beyond those afforded by the Constitution; specifically,  the  statute  prevents  the  federal  government  from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability."  42 U.S.C. § 2000bb-1(a).  The Court expressly limited its holding to that statutory context. *Hobby Lobby*, 134 S. Ct. at 2785.  Here, Plaintiffs have not asserted claims under RFRA; nor could they, because they challenge only state laws and regulations, to which RFRA does not apply.

176 F.3d 1202, 1206 (9th Cir. 1999). For laws that are not neutral or not generally applicable, strict scrutiny applies. *See Lukumi*, 508 U.S. at 531–32 ("A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest.").

The tests for "[n]eutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Id.* at 531. Nevertheless, we must consider each criterion separately so as to evaluate the text of the challenged law as well as the "effect . . . in its real operation." *Id.* at 535. Accordingly, we assess whether the rules are neutral and generally applicable.[5]

## 1. Neutrality

"[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral . . . ." *Id.* at 533. "A law lacks facial neutrality if it

---

[5] Defendants argue that *Stormans I*, 586 F.3d 1109, which vacated the district court's grant of a preliminary injunction, constitutes the law of the case. We disagree. The "general rule" is that our decisions "at the preliminary injunction phase do not constitute the law of the case." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. Dep't of Agric.*, 499 F.3d 1108, 1114 (9th Cir. 2007) (internal quotation marks omitted). Although there is an exception to the general rule for "conclusions on pure issues of law," *id.*, the exception does not apply here because we are analyzing a mixed question of law and fact, *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 804–05 (9th Cir. 2011). But *Stormans I* is "law of the circuit" and, therefore, is relevant. *Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc) (internal quotation marks omitted), *aff'd*, *Arizona v. Inter Tribal Council of Ariz., Inc.*, 133 S. Ct. 2247 (2013).

refers to a religious practice without a secular meaning discernable from the language or context." *Id.* Because the rules at issue here make no reference to any religious practice, conduct, belief, or motivation, they are facially neutral.

The more challenging question is whether the rules are operationally neutral. In *Lukumi*, practitioners of the Santeria religion, which prescribes ritual animal sacrifice as a principal form of devotion, challenged city ordinances restricting the slaughter of animals. *Id.* at 524–25. One of the challenged ordinances flatly prohibited the sacrifice of animals, but the definition of "sacrifice" excluded "almost all killings of animals except for religious sacrifice" and provided an additional exemption for kosher slaughter. *Id.* at 535–36. The net result of this definition, the Court ruled, was that "few if any killings of animals are prohibited other than Santeria sacrifice." *Id.* at 536. Thus, because of the way the ordinance operated in practice, it (and two others) actually prohibited *only* Santeria sacrifice. *Id.* In this way, the challenged ordinances accomplished a "religious gerrymander," an impermissible attempt to target religious practices through careful legislative drafting. *Id.* at 535–37 (internal quotation marks omitted).

Unlike the ordinances at issue in *Lukumi*, the rules here operate neutrally. As an initial matter, we note that, as they pertain to *pharmacists*, the rules specifically *protect* religiously motivated conduct. The Commission created a right of refusal for pharmacists by allowing pharmacies to "accommodate" individual pharmacists who have religious, moral, philosophical, or personal objections to the delivery of particular prescription drugs. The rules do not require

pharmacists to dispense a prescription medication to which they object.

As they pertain to *pharmacies*, the rules' delivery requirement applies to *all* objections to delivery that do not fall within an exemption, regardless of the motivation behind those objections. *See Stormans I*, 586 F.3d at 1131 ("[A]side from the exemptions, any refusal to dispense a medication violates the rules, and this is so regardless of whether the refusal is motivated by religion, morals, conscience, ethics, discriminatory prejudices, or personal distaste for a patient."). By prohibiting all refusals that are not specifically exempted, the rules establish a practical means to ensure the safe and timely delivery of all lawful and lawfully prescribed medications to the patients who need them. *See id.* ("[T]he object of the rules was to ensure safe and timely patient access to lawful and lawfully prescribed medications."); *see also* Wash. Rev. Code § 18.64.005 (assigning to the Commission the responsibility of regulating the practice of pharmacy so as to protect and promote the public health, safety, and welfare).

The delivery requirement also applies to all prescription products—not just Plan B, *ella*, or other emergency contraceptives. In both trial testimony and official documents accompanying the final regulations, Commission members expressed their expectation that the Delivery Rule's effect would extend beyond Plan B, for example, by guaranteeing access to medications for HIV patients. Evidence before the Commission and at trial demonstrated that pharmacists and pharmacies had refused to fill prescriptions for several kinds of medications other than emergency contraceptives. Specific examples included refusals, for a variety of reasons, to deliver

diabetic syringes, insulin, HIV-related medications, and Valium.

The possibility that pharmacies whose owners object to the distribution of emergency contraception for religious reasons may be burdened disproportionately does not undermine the rules' neutrality. The Free Exercise Clause is not violated even if a particular group, motivated by religion, may be more likely to engage in the proscribed conduct. *See Reynolds v. United States*, 98 U.S. 145, 166–67 (1878) (upholding a ban on polygamy despite the fact that polygamy was practiced primarily by members of the Mormon Church); *cf. United States v. O'Brien*, 391 U.S. 367, 378–86 (1968) (rejecting a First Amendment challenge to a statutory prohibition of the destruction of draft cards even though most violators likely would be opponents of war). In *American Life League, Inc. v. Reno*, 47 F.3d 642, 646, 656 (4th Cir. 1995), the Fourth Circuit upheld the Federal Freedom of Access to Clinic Entrances Act of 1984 ("Access Act"), which prohibited conduct intended to injure, intimidate, or interfere with persons seeking to obtain or provide reproductive health services. Even after acknowledging that Congress passed the law in response to religiously motivated protests at reproductive health clinics, the court found no free exercise violation. *Id.* at 654 ("[T]he Access Act punishes conduct for the harm it causes, not because the conduct is religiously motivated."). Although the Access Act may have the effect of disproportionately punishing religiously motivated violators, it makes no difference whether a violator acts because of religious convictions or for other reasons, for "[t]he same conduct is outlawed for all." *Id.*

Here, similarly, the rules prescribe and proscribe the same conduct for all, regardless of motivation. The rules require,

subject to specific exemptions, that all pharmacies deliver all lawfully prescribed drugs. And the rules allow the Commission to sanction conduct (refusal to deliver a lawfully prescribed drug) because of the harm that it causes—patients' being denied safe and timely access to their lawfully prescribed medications—not because the conduct is religiously motivated. *Id.* Neutrality is not destroyed by the supposition that pharmacies whose owners have religious objections to emergency contraception will be burdened disproportionately, or by the speculation that pharmacists with religious objections to Plan B disproportionately will require accommodation from their pharmacy-employers. *Stormans I*, 586 F.3d at 1131.

Plaintiffs counter that the Commission's decision not to allow facilitated referrals demonstrates discriminatory intent, which undercuts the rules' neutrality. According to Plaintiffs, facilitated referrals are a reasonable accommodation for objecting pharmacies because facilitated referrals do not jeopardize the timely delivery of prescription medication. Plaintiffs assert that the Commission's decision could have no purpose other than to discriminate against religiously motivated refusals to deliver. We disagree.

When a drug is unavailable at a particular pharmacy, facilitated referrals help the customer receive the prescribed drug by traveling to another pharmacy where it is available. But the immediate delivery of a drug is always a faster method of delivery than requiring a customer to travel elsewhere. Speed is particularly important considering the time-sensitive nature of emergency contraception and of many other medications. The time taken to travel to another pharmacy, especially in rural areas where pharmacies are sparse, may reduce the efficacy of those drugs. Additionally,

testimony at trial demonstrated how facilitated referrals could lead to feelings of shame in the patient that could dissuade her from obtaining emergency contraception altogether. In our view, the Commission's decision not to allow facilitated referrals falls within its stated goal of ensuring timely and safe delivery of prescription medications and, accordingly, does not demonstrate discriminatory intent.

As a matter of logic, we reject Plaintiffs' argument that *Defendants' 2010* mid-litigation stipulation regarding facilitated referrals is evidence of discriminatory intent by *the Commission* when it adopted the rules in *2007*. Moreover, the existence of other means that might achieve the Commission's purpose does not necessarily destroy the rules' neutrality.

Nor does the legislative and administrative history behind the rules undermine their neutrality. Whether a court may examine legislative history in this context remains an open question. *Id.* at 1131–32. Even if we should analyze that history, it does not reveal improper intent. As we explained in *Stormans I*, the administrative history "hardly reveals a single design to burden religious practice; rather, it is a patchwork quilt of concerns, ideas, and motivations." *Id.* at 1133. "The collective will of the [Commission] cannot be known, except as it is expressed in the text and associated notes and comments of the final rules." *Id.*

To the extent that the record reveals anything about the Commission's motivation in adopting the rules, it shows that the Commission approached the problem from the point of view of ensuring patients' timely access to prescription medications. The Commission did not act solely in response to religious objections to dispensing emergency

contraception. It was also concerned with the safe and timely delivery of many other drugs, which may or may not engender religious objections. *See id.* at 1114 (noting that public testimony "addressed the availability of a variety of prescription medicines and devices, such as syringes, prenatal vitamins, oral contraceptives, and AIDS medications"). For example, the Commission had heard testimony that patients "were not getting access to" prescription medications and devices used to treat diabetes and HIV. Similarly, the district court noted that "since 1997 there have been at least nine complaints to the [Commission] regarding a pharmacy's refusal (or failure) to dispense drugs other than Plan B." Accordingly, the Commission was "motivated by concerns about the potential deleterious effect on public health that would result from allowing pharmacists to refuse to dispense lawfully prescribed medications based on personal, moral objections (of which religious objections are a subset)."[6] *Id.* at 1133. Nothing in the record developed since *Stormans I* alters that conclusion. Therefore, the district court clearly erred in finding discriminatory intent.

---

[6] Even if the Commission had drafted and adopted the rules solely in response to incidents of refusal to deliver Plan B, that fact would not *necessarily* mean that the rules were drafted with the intent of discriminating against religiously motivated conduct. *See Stormans I*, 586 F.3d at 1131; *Am. Life League*, 47 F.3d at 654; *see also Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 999 (7th Cir. 2006) (finding no free exercise violation even if a zoning ordinance targeted a proposed plan for a new church, because the commission was concerned about the non-religious effect of the church on the community); *Knights of Columbus, Council No. 94 v. Town of Lexington*, 272 F.3d 25, 35 (1st Cir. 2001) (finding no free exercise violation although a regulation limiting displays on the town green was adopted in response to a flood of requests from religious groups seeking to erect displays).

For the foregoing reasons, we hold that the rules operate neutrally.

## 2.  General Applicability

We next must consider whether the rules are generally applicable. *Lukumi*, 508 U.S. at 542; *Smith*, 494 U.S. at 879–81. A law is not generally applicable if it, "in a selective manner[,] impose[s] burdens only on conduct motivated by religious belief." *Lukumi*, 508 U.S. at 543. Plaintiffs argue that the rules are not generally applicable because (a) they are substantially underinclusive in their prohibition of religious objections but allowance of certain secular exemptions; (b) they contain vague, open-ended wording that affords individualized discretion that could rest on discriminatory animus; and (c) the Commission has selectively enforced the rules against, and only against, Plaintiffs.

### a.  Substantial Underinclusion

A law is not generally applicable if its prohibitions substantially underinclude non-religiously motivated conduct that might endanger the same governmental interest that the law is designed to protect. *Id.* at 542–46. In other words, if a law pursues the government's interest "only against conduct motivated by religious belief" but fails to include in its prohibitions substantial, comparable secular conduct that would similarly threaten the government's interest, then the law is not generally applicable.[7] *Id.* at 545.

---

[7] For example, in *Lukumi*, the city claimed that the ordinances at issue advanced two interests: protecting the public health and preventing cruelty to animals. 508 U.S. at 543. The ordinances failed to prohibit secular conduct that would nevertheless endanger these interests in the same way

The rules require pharmacies to deliver prescription medications, but they also carve out several enumerated exemptions. *See* Wash. Admin. Code § 246-869-010(1), (2) (exempting pharmacies from the duty to deliver when the prescription cannot be filled due to lack of payment; because the prescription may be fraudulent, erroneous, or incomplete; because of declared emergencies; because the pharmacy lacks specialized equipment or expertise; or when a drug or device is unavailable despite good faith compliance with the Stocking Rule). Plaintiffs assert that those exemptions threaten the State's interest in patient safety to the same degree as would a religious exemption. In Plaintiffs' view, the rules are substantially underinclusive because of the secular exemptions. We disagree.

As we held in *Stormans I*, the enumerated exemptions are "necessary reasons for failing to fill a prescription" in that they allow pharmacies to operate in the normal course of business. 586 F.3d at 1134. Indeed, we reassert the following:

---

that religiously motivated conduct would. *Id.* Prohibiting Santeria animal sacrifices may have advanced the government's interests, but so would have prohibiting several types of secular killings. *See id.* ("Many types of animal deaths or kills for nonreligious reasons are either not prohibited or approved by express provision."); *id.* at 544 ("The health risks posed by the improper disposal of animal carcasses are the same whether [prohibited] Santeria sacrifice or some [non-prohibited] nonreligious killing preceded it."). The ordinances' failure to prohibit non-religious conduct endangered the government interest "in a similar or greater degree" than the religiously motivated conduct. *Id.* at 543. It was this substantial underinclusion that led the Court to conclude that the ordinances were not generally applicable. *Id.*

> Nobody could seriously question a refusal to fill a prescription because the customer did not pay for it, the pharmacist had a legitimate belief that it was fraudulent, or supplies were exhausted or subject to controls in times of declared emergencies. Nor can every single pharmacy be required to stock every single medication that might possibly be prescribed, or to maintain specialized equipment that might be necessary to prepare and dispense every one of the most recently developed drugs. Instead of increasing safe and legal access to medications, *the absence of these exemptions would likely drive pharmacies out of business or, even more absurdly, mandate unsafe practices*. Therefore, the exemptions actually increase access to medications by making it possible for pharmacies to comply with the rules, further patient safety, and maintain their business.

*Id.* at 1135 (emphasis added). In that way, the exemptions further the rules' stated goal of ensuring timely and safe patient access to medications. Evidence presented at trial does not alter the quoted conclusions that we reached in *Stormans I*.

But the district court found that there are several *unwritten* exemptions to the Delivery Rule's delivery requirement. *Stormans*, 854 F. Supp. 2d at 970–72. These are scenarios, the district court explained, in which a pharmacy's refusal to deliver medication was "permitted in practice" despite the lack of an enumerated exemption in the text of the rules. *Id.* The court asserted that, for instance,

some pharmacies would "not deliver the drug over the counter because it requires extra recordkeeping (e.g., Sudafed)," "not stock the drug because it is an expensive drug," or "not stock the drug because it would attract crime (e.g., Oxycontin)." *Id.* at 970. The court found that, in other instances, pharmacies refused to perform "simple compounding" or "unit dosing" packaging and refused to carry and dispense specific drugs that require the monitoring of patient dosages. *Id.*

The district court's findings that those practices had occurred are not clearly erroneous, but the court clearly erred by concluding that the Commission permitted those practices or exempted them from enforcement. Trial testimony shows that, if complaints were filed about those practices, the Commission would follow its normal procedure in deciding whether to investigate and to initiate an enforcement action. It has not received such complaints. The fact that no one has filed a complaint with the Commission, to trigger its action, does not make the practices permissible under the rules. The Commission has never issued an official interpretation of the rules suggesting that those practices are permitted. An individual Commission member's view about how the Commission might act if it received a complaint has no bearing on the Commission's collective interpretation of the rules. Accordingly, the evidence produced at trial did not demonstrate that the rules are substantially underinclusive.

### b. Individualized Exemptions

Plaintiffs also contend that the rules are not generally applicable because they contain discretionary text that allows those who enforce the rules to discriminate against religion. The "individualized exemptions" doctrine, which Plaintiffs

thus invoke, was developed in a series of cases involving unemployment benefits programs under which persons were ineligible for benefits if they failed to accept available employment "without good cause." *See Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 717–18 (1981) (finding unconstitutional the denial of unemployment benefits when the state determined that the claimant's religiously motivated voluntary termination of his employment in the production of armaments was "without good cause"); *Sherbert v. Verner*, 374 U.S. 398, 402–10 (1963) (finding unconstitutional a state's denial of unemployment benefits when the state determined that the claimant's religiously motivated refusal to work on Saturday was "without good cause"); *see also Hobbie v. Unemp't Appeals Comm'n*, 480 U.S. 136, 140–46 (1987) (finding unconstitutional a state's denial of benefits to a claimant whose employment was terminated because she refused to work on Saturday, as was required by her religion). The Court opined that an open-ended, purely discretionary standard like "without good cause" easily could allow discrimination against religious practices or beliefs. *Sherbert*, 374 U.S. at 406; *see also Lukumi*, 508 U.S. at 537–38 (holding that the city's determination that Santeria animal sacrifice was "unnecessary"—and thus in violation of the ordinance at issue—"devalue[d] religious reasons for killing by judging them to be of lesser import than nonreligious reasons," meaning that "religious practice [was] being singled out for discriminatory treatment").

But the Court has limited that doctrine. In *Smith*, the Court refused to extend that reasoning to a criminal prohibition on the use of peyote that could disqualify a violator from receiving state unemployment benefits. 494 U.S. at 882–85; *see id.* at 884 (noting that the reasoning

of *Sherbert*, *Thomas*, and *Hobbie* had "nothing to do with an across-the-board criminal prohibition on a particular form of conduct"). The Court explained that the individual exemption test was "developed in a context that lent itself to individualized governmental assessment of the reasons for the relevant conduct." *Id.* at 884.

Here, Plaintiffs point to two phrases in support of their argument that the Delivery Rule contains discretionary text: "substantially similar" (located in the Delivery Rule's introduction) and "good faith compliance" (located in the Delivery Rule's fifth exemption). We conclude, however, that the rules do not afford unfettered discretion that could lead to religious discrimination because the provisions are tied to particularized, objective criteria.

The introduction to the list in the Delivery Rule allows exemptions in circumstances that are "substantially similar" to those in the five enumerated exemptions in section 246-869-010(1) of the Washington Administrative Code. Thus, the introductory text is tethered directly to those five business-related exemption categories.

The fifth exemption is broader than the other four in that it requires "good faith compliance" with the Stocking Rule. Wash. Admin. Code § 246-869-010(1)(e). Similarly, though, that exemption ties directly to the objective standard of meeting patients' needs by providing a representative assortment of drugs, as is required by the Stocking Rule. And, again, we note that Plaintiffs do not challenge the Stocking Rule.

As mentioned previously, Plaintiffs' reliance on evidence of individual Commission members' opinions does not

support the conclusion that the exemptions will be interpreted broadly to permit discriminatory treatment of religion or religiously motivated conduct. The Commission collectively has never issued commentary supporting such a broad interpretation. To the extent that the Commission has made official comments, those comments contradict Plaintiffs' assertion that the Commission would allow exemptions except for religious reasons; for instance, the Commission has stated that pharmacies may not object to delivering drugs because the drugs are too expensive.

The mere existence of an exemption that affords some minimal governmental discretion does not destroy a law's general applicability. *See Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 651 (10th Cir. 2006) ("Consistent with the majority of our sister circuits, . . . we have already refused to interpret *Smith* as standing for the proposition that a secular exemption automatically creates a claim for a religious exemption."). As the Third Circuit explained in *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch*:

> What makes a system of individualized exemptions suspicious is the possibility that certain violations may be condoned when they occur for secular reasons but not when they occur for religious reasons. In *Blackhawk*[ *v. Pennsylvania*, 381 F.3d 202, 211 (3d Cir. 2004)], it was not the mere existence of an exemption procedure that gave us pause but rather the fact that the Commonwealth could not coherently explain what, other than the religious *motivation* of [the prohibited]

conduct, justified the unavailability of an exemption.

510 F.3d 253, 276 (3d Cir. 2007); *cf. Grace United Methodist Church*, 451 F.3d at 651 ("Indeed, in the land use context, the Sixth, Seventh, Eighth, and Eleventh Circuits have rejected a *per se* approach and instead apply a fact-specific inquiry to determine whether the regulation at issue was motivated by discriminatory animus, or whether the facts support an argument that the challenged rule is applied in a discriminatory fashion that disadvantages religious groups or organizations."). In summary, because the exemptions at issue are tied directly to limited, particularized, business-related, objective criteria, they do not create a regime of unfettered discretion that would permit discriminatory treatment of religion or religiously motivated conduct.[8]

### c. Selective Enforcement

Plaintiffs also argue that the Commission has enforced the rules selectively in two ways: by enforcing them against Ralph's pharmacy but not against Catholic-affiliated hospitals; and by enforcing them against religiously

---

[8] Although the challenged rules on their face, and the official commentary, demonstrate that the discretionary text in the exemptions is tied to specific, objective criteria, we note that the Commission has the power to change its interpretation of its rules. If the Commission were to adopt an interpretation that penalizes religious conduct while permitting a broad range of similar secular conduct, our holdings today would not prevent a future as-applied challenge. *See Monahan v. N.Y. City Dep't of Corr.*, 214 F.3d 275, 290 (2d Cir. 2000) (noting that a previous lawsuit challenging the constitutionality of a government policy would not bar subsequent as-applied challenges to the same policy, should the execution or interpretation of the policy change).

motivated violations but not against secularly motivated violations.

The Commission enforces the Delivery Rule and section (1) of the Stocking Rule through a complaint-driven process.[9] Although the Commission may have different enforcement mechanisms for rules not at issue in this litigation, the record shows that the Commission has adopted a passive enforcement process with respect to the rules listed above; that is, it takes action only when a consumer files a complaint of a violation.[10]   Plaintiffs assert that Catholic-affiliated pharmacies also refuse to stock or deliver Plan B or *ella*.  But the record contains no evidence that any complaints have been filed against Catholic-affiliated pharmacies.   The Commission did not investigate alleged non-compliance among Catholic pharmacies for the simple reason that the Commission   received   no   complaints   against   those

---

[9] Although the district court found that the Commission actively enforced sections (2) through (6) of the Stocking Rule by means of, inter alia, inspections, test-shopping, newsletters, and Commission-initiated complaints, the Commission is not required to use the same mechanisms to enforce every rule. Accordingly, we disagree with the district court's conclusion that the Commission's methods of enforcing *other* rules demonstrates selective enforcement with respect to the Delivery Rule and section (1) of the Stocking Rule.

[10] Although the district court found that the Commission itself initiated a complaint under the Stocking Rule against Ralph's, the Commission's enforcement process remained consumer-driven.  The Commission filed a complaint for procedural reasons; the original genesis was a consumer complaint that had been filed against a pharmacist employed at Ralph's. The Commission terminated the complaint against the pharmacist and filed the complaint against Ralph's because the individual pharmacist would have dispensed Plan B if Ralph's had carried it.  Accordingly, the Commission's action was in reality initiated by a consumer's complaint.

pharmacies. The record does not show that the Commission has made religiously based distinctions in its complaint-driven enforcement of the rules. The record, similarly, contains no evidence that the Commission responded differently to complaints about Catholic-affiliated pharmacies than it did to complaints about Ralph's. Nor does the evidence at trial show that consumers filed complaints about similarly situated, secularly motivated refusals to deliver prescription drugs.[11] What the record does show is that consumers filed many complaints against Ralph's in connection with the store's policy of declining to stock and deliver Plan B and *ella*. In short, selective enforcement cannot be inferred from the fact that Ralph's has been implicated in a disproportionate percentage of investigations, because the Commission responds only to the complaints that it receives.

That there may be other means by which the Commission could enforce the rules does not weaken this conclusion. The executive branch has an array of enforcement options, and it is not our role to second-guess how the executive branch exercises its discretion to enforce administrative regulations. *Wayte v. United States*, 470 U.S. 598, 607–08 (1985). The Commission quite reasonably could have decided that a "passive enforcement" system—one that relies on reports of non-compliance—is the most efficient and cost-effective

---

[11] Although three complaints were filed against entities other than Ralph's for failing to dispense Plan B, those entities were not similarly situated to Ralph's. The record shows that the Commission did not need to take further action because the other pharmacies reassured the Commission that they would re-stock the medication; the original failure to dispense Plan B occurred simply because the pharmacies were temporarily out of stock. By contrast, Plaintiffs refuse to stock Plan B and *ella* at all times.

means of enforcement.[12] *See id.* at 612–13.  That is especially true in the present context, because those who file complaints—customers of pharmacies—are the rules' intended beneficiaries.  Plaintiffs' suggestion that the Commission adopted the complaint system with the specific intent to disadvantage religious objectors to emergency contraception lacks any foundation in the record.  The Commission has utilized the complaint-driven system to enforce the Stocking Rule since its enactment in 1967, decades before Plan B or *ella* came on the market.

   In short, no evidence supports the district court's finding that the Commission's enforcement of the rules is other than complaint-driven.  Because no complaints have been filed against Catholic-affiliated pharmacies or against other pharmacies for non-religious refusals, other pharmacies are

---

   [12] *Wayte* concerned a passive enforcement system used to prosecute persons who failed to register for the draft.  The Court described some of the benefits of this system:

> [B]y relying on reports of nonregistration, the Government was able to identify and prosecute violators without further delay.  Although it still was necessary to investigate those reported to make sure that they were required to register and had not, the Government did not have to search actively for the names of these likely violators.  Such a search would have been difficult and costly at that time.  Indeed, it would be a costly step in any "active" prosecution system involving thousands of nonregistrants.  The passive enforcement program thus promoted prosecutorial efficiency.

470 U.S. at 612.  Those sentiments apply equally here.

not "similarly situated" to Ralph's.[13]  Therefore, they provide no evidence of selective enforcement.

### 3.  Application of Rational Basis Review

Because the rules at issue are neutral and generally applicable, we review them for a rational basis.  *Guam v. Guerrero*, 290 F.3d 1210, 1215 (9th Cir. 2002); *Miller*, 176 F.3d at 1206.  Under rational basis review, we must uphold the rules if they are rationally related to a legitimate governmental purpose.  *Gadda v. State Bar of Cal.*, 511 F.3d 933, 938 (9th Cir. 2007).  Plaintiffs "have the burden to negat[e] every conceivable basis which might support [the rules]," *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (internal quotation marks omitted), a burden that they have failed to meet.  The rules are rationally related to Washington's legitimate interest in ensuring that its citizens have safe and timely access to their lawful and lawfully prescribed medications.

Defendants' stipulation regarding "facilitated referrals" does not change our conclusion.  Whether facilitated referrals also further patients' access to medication is irrelevant.  On rational basis review, Plaintiffs still have the burden to negate the Commission's chosen method for achieving that goal.  *Id.* Because Plaintiffs have failed to meet that burden, the rules survive rational basis review.

In sum, Plaintiffs' free exercise claim fails.

---

[13] As noted previously, the three complaints filed against entities other than Ralph's are not comparable secular refusals because those entities experienced a temporary shortage and agreed to re-stock the medication.

## B.  Equal Protection Claim

The district court also held that the rules at issue violated Plaintiffs' equal protection rights under the Fourteenth Amendment.  The court reasoned that Plaintiffs' equal protection claim is coextensive with their free exercise claim.  On appeal, Plaintiffs do not advance any equal protection arguments independent of their arguments concerning the Free Exercise Clause.  Because we reject Plaintiffs' free exercise claim, their equal protection claim, as they have framed it, also fails.

## C.  Due Process Claim

Plaintiffs also argue that the rules violate their due process rights under the Fourteenth Amendment.  The district court rejected the argument and declined to enter a judgment that the rules violate the Due Process Clause.  Defendants urge us not to reach this issue on appeal because Plaintiffs failed to cross-appeal.  *See Greenlaw v. United States*, 554 U.S. 237, 244 (2008) (holding that, under the "cross-appeal rule, . . . an appellate court may not alter a judgment to benefit a nonappealing party"); *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 479 (1999) ("Absent a cross-appeal, an appellee may urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court, but may not attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary." (internal quotation marks omitted)).  We reject Defendants' suggestion.

Although "there is no bright-line test" for determining whether an argument on appeal falls within the scope of the

cross-appeal rule, *Lee v. Burlington N. Santa Fe Ry. Co.*, 245 F.3d 1102, 1107 (9th Cir. 2001), we need not explore that issue in depth here. "Because the cross-appeal requirement is a rule of practice and not a jurisdictional bar, an appellate court has broad power to make such dispositions as justice requires." *Id.* (internal quotation marks omitted). Even assuming that Plaintiffs' due process argument is an attempt to enlarge their own rights or lessen Defendants' rights, in the absence of prejudice to Defendants and in the interest of fairness to Plaintiffs, we exercise our discretion to reach the issue.

Plaintiffs assert that the rules infringe a fundamental right, which they characterize as the "right to refrain from taking human life." Laws that infringe a "fundamental" right protected by the Due Process Clause are constitutional only if "the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993). Laws that do not infringe a fundamental right survive substantive-due-process scrutiny so long as they are "rationally related to legitimate government interests." *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997).

The Supreme Court "require[s] in substantive-due-process cases a 'careful description' of the asserted fundamental liberty interest." *Id.* at 721. Accordingly, we must formulate the asserted right by carefully consulting both the scope of the challenged regulation and the nature of Plaintiffs' allegations. *See, e.g.*, *id.* at 723–24 (consulting the text of the challenged state statute in reformulating the asserted right); *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) ("It is important, therefore, to focus on the allegations in the complaint to determine how petitioner describes the constitutional right at stake . . . .").

For example, in *Flores*, 507 U.S. at 297, a class of juvenile detainees challenged a regulation that permitted their release to a parent, close relative, or legal guardian generally but permitted their release to others only in certain circumstances. The Supreme Court rejected the plaintiffs' characterization of the right to "freedom from physical restraint" as too broad and concluded that "the right at issue is the alleged right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care institution." *Id.* at 302; *see also Glucksberg*, 521 U.S. at 722–23 (rejecting the plaintiffs' characterization of "the liberty to shape death" and, consulting the text of the challenged state statute, reformulating the right as "a right to commit suicide which itself includes a right to assistance in doing so"); *Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 277–79 (1990) (referring to the right at issue as the "constitutionally protected right to refuse lifesaving hydration and nutrition" instead of the more generic "right to die"); *Raich v. Gonzales*, 500 F.3d 850, 864 (9th Cir. 2007) (generally accepting Raich's "careful statement" of the right as the "right to make life-shaping medical decisions that are necessary to preserve the integrity of her body, avoid intolerable physical pain, and preserve her life" but only after adding "the centerpiece—the use of marijuana—to Raich's proposed right" (brackets and internal quotation marks omitted)). "This degree of specificity is required." *Raich*, 500 F.3d at 864 n.12. "[T]he right must be carefully stated and narrowly identified before the ensuing analysis can proceed." *Id.* at 864.

Here, Plaintiffs characterize the fundamental liberty interest at stake as the "right to refrain from taking human life." That formulation is too broad in two important respects. We must be "more precise." *Glucksberg*, 521 U.S. at 723.

First, Plaintiffs have not attempted to establish that Plan B and *ella objectively* cause the taking of human life. As the district court noted, "the parties do not agree that a life is at stake. There is no doubt about the consequences of assisted suicide; here, there is doubt." In response, Plaintiffs have neither argued nor presented evidence to establish that the drugs objectively cause the taking of human life. Instead, Plaintiffs have emphasized that their "religious beliefs form the foundation" of their due process claim. They seek to prove a violation of their due process rights by establishing that: "Plaintiffs believe that human life begins at the point of union of the female ovum and male sperm, or fertilization"; they "believe Plan B may prevent implantation of a fertilized ovum";[14] and their "religious beliefs are sincere." Accordingly, we must refine the asserted fundamental liberty interest to account for the subjectivity of Plaintiffs' allegations.

A second refinement is also necessary. The disputed rules do not apply generally to the population as a whole. *See, e.g.*, *Glucksberg*, 521 U.S. at 707 (noting that the criminal

---

[14] We doubt that courts are equipped to make a factual finding concerning whether life begins at fertilization. *Roe v. Wade*, 410 U.S. 113, 159 (1973). Whether the drugs at issue prevent implantation of a fertilized ovum, however, strikes us as a proper subject for a finding of fact. Nevertheless, Plaintiffs declined to introduce evidence on that point, so we address Plaintiffs' claim as presented—which rests on their "belief" that the drugs prevent implantation.

prohibition against assisting suicide applies to all persons). Instead, like the challenged regulations in *Flores*, 507 U.S. at 297, the rules here apply only to persons in specific circumstances. In particular, the rules require the delivery of medication only by *pharmacies*, which are professional businesses subject to licensing and regulatory requirements.[15] Accordingly, as the Court did in *Flores*, 507 U.S. at 302, we must refine the asserted right to account for the particularized scope of the challenged law.

Taking into account those two refinements, the proper formulation of the asserted liberty interest at stake is the right to own, operate, or work at a licensed professional business free from regulations requiring the business to engage in activities that one sincerely believes lead to the taking of human life.   With that "careful description" in mind, *Glucksberg*, 521 U.S. at 724, we turn to whether the asserted right is, "objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed," *id.* at 720–21 (citations and internal quotation marks omitted).  We must be "reluctant to expand the concept of substantive due process" and must "exercise the utmost care whenever we are asked to break new ground in this field."  *Id.* at 720 (internal quotation marks omitted).

We conclude that Plaintiffs have not established the fundamental nature of the asserted right.  Plaintiffs cite a law review article that offers historical evidence concerning, among other things, legal protections for those wishing not to participate in military service, capital punishment, and

---

[15] As discussed above, the rules do not require delivery of the medications by individual *pharmacists*.

assisted suicide.  Mark L. Rienzi, *The Constitutional Right Not to Kill*, 62 Emory L.J. 121, 130–47 (2012).  Those topics concern non-participation in events that *objectively* cause the taking of human life.  Accordingly, they have little, if any, probative weight on the topic whether our Nation has a deep tradition of protecting the non-participation of persons who *subjectively* believe that an event leads to the taking of human life.  *See id.* at 147 (noting that, with respect to military service, capital punishment, and assisted suicide, "there is essentially no room for debate that each of these contexts involves the killing of other human beings" and that the "context of abortion, of course, is different").  Even if we assume that society generally protects personal non-participation in contexts that indisputably cause death, it does not follow that society is equally concerned with protecting non-participation in every context that an individual might believe leads to death.  *Cf. Glucksberg*, 521 U.S. at 727 ("That many of the rights and liberties protected by the Due Process Clause sound in personal autonomy does not warrant the sweeping conclusion that any and all important, intimate, and personal decisions are so protected . . . .").  Moreover, very few of the legal sources presented by Plaintiffs concern a right of non-participation by *businesses*.

We recognize that there is a "trend of protecting conscientious objectors to abortions," Rienzi, 62 Emory L.J. at 148, and that most—but not all—states do not require pharmacies to deliver prescriptions, such as Plan B and *ella*, in a timely manner.  On balance, however, we are unconvinced that the right to own, operate, or work at a licensed professional business free from regulations requiring the business to engage in activities that one sincerely believes leads to the taking of human life is "so rooted in the traditions and conscience of our people as to be ranked as

fundamental." *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934). Accordingly, we decline to recognize a new fundamental right.

Because the rules do not infringe a fundamental right, they need only be "rationally related to legitimate government interests." *Glucksberg*, 521 U.S. at 728. As explained above, in Part A-3 of our discussion, p. 37, the rules meet that test.

**REVERSED.**